1

2

3

4

5

6

7

8    UNITED STATES DISTRICT COURT

9    NORTHERN DISTRICT OF CALIFORNIA

10   San Francisco Division

| | |
|---|---|
| 11 WORLD CHAMP TECH LLC, | Case No. 21-cv-03202-LB |
| 12     Plaintiff, | |
| 13    v. | **ORDER GRANTING SUMMARY JUDGMENT TO THE DEFENDANT** |
| 14 PELOTON INTERACTIVE, INC., | Re: ECF Nos. 134, 135 |
| 15     Defendant. | |

16

## INTRODUCTION

The plaintiff World Champ Tech, which offers a mobile-fitness app called "Bike+" and owns a trademark registration for the same name, sued the defendant Peloton Interactive for trademark infringement and other claims after the defendant launched a new line of interactive stationary bicycles under the name "Peloton Bike+." The defendant raised various affirmative defenses — such as that the plaintiff abandoned its mark by not updating its app and by showing other signs of inactivity — and counterclaimed for trademark cancellation due to abandonment and fraud on the USPTO (in the form of misrepresentations about the continued operability of the app). The parties each moved for summary judgment: the defendant contends that consumers are not likely to be confused and the plaintiff cannot show damages, and the plaintiff contends that the defendants' affirmative defenses and counterclaims are not viable. The court grants the defendant's motion for summary judgment on the ground that as a matter of law, there is no likelihood of confusion.

United States District Court
Northern District of California

**STATEMENT**

## 1. The Plaintiff and its Apps

The plaintiff is a fitness-technology company that was founded in 2012 by professional cyclist James Mattis and professional cyclist and Olympic windsurfer Ted Huang. Mr. Mattis is now the plaintiff's sole member. He developed the Bike+ app, which was first released in February 2014 for the Apple iPhone and Pebble Watch. The 2014 app was a metric-tracking cycling app that was designed to "track speed, distance, altitude, and grade." It also "allowed users to capture photos or video along a ride, activate interval timers during a ride, and post details to Facebook, Twitter, or other services." Mr. Mattis testified that the app was "more focused on outdoor activities" but was always "available for indoor bike riding." The app name was displayed as "Bike+" on the iPhone home screen and as "Bike+ [bike more]" on the Apple App Store, as follows:



The app was marketed through the Apple App Store, the plaintiff's website, social media including Facebook advertising, and sponsorships and endorsements.[1]

Mr. Mattis described the 2014 app's lifecycle. The app, according to Mr. Mattis, "enjoyed moderate success in the early years after its release, producing tens of thousands of downloads and some revenue" in the form of in-app subscriptions. Then some changes happened: for example, Mr. Huang left the company in late 2014, the Apple Watch was released in fall 2014 and achieved commercial success, and downloads declined after a 2015 peak. By the end of 2016, Mr. Mattis "became convinced the company needed an alternative direction." He then focused on developing a new app dedicated to the Apple Watch. Facebook advertising for the 2014 app — which

---

[1] Mattis Decl. – ECF No. 137-3 at 1–4 (¶¶ 1–12); Mattis Dep. – ECF No. 136-10 at 8 (p. 106:17–22); App Store Preview – ECF No. 136-9 at 2. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

required payment only "based on impressions or conversions to downloads" — continued until 2019. The app also remained available for download, including for Pebble Watch users; even though the Pebble Watch was discontinued in late 2016, "there remains a loyal following among the Pebble Watch community." But the app was not updated after 2016 because Mr. Mattis considered focusing on the new app to be the best use of his resources.[2]

The defendant also offered evidence about the plaintiff from this time period. Certain 2014 projections and comments by the plaintiff differed from what later happened.[3] At his deposition, Mr. Mattis testified that: it may have been in 2016 that he last funded Facebook advertising or created a new Facebook ad; the plaintiff has removed the 2014 app from its website; the plaintiff does not have data sufficient to indicate how many bike rides have been tracked using the app; Mr. Mattis could not recall opening the 2014 app since 2019 (though he often works with the latest unreleased build of the app); and Mr. Mattis doesn't know from personal use how functional the 2014 app is (though he receives crash reports from the Apple App Store).[4] Also, by the end of 2016, the plaintiff had not paid taxes since 2015 and its certificate of incorporation was therefore suspended.[5] (This changed after the defendant launched its Bike+ product in 2020, as discussed below.)

Mr. Mattis continued developing a new version of the Bike+ app from 2017 until 2020, writing "over 2.4 million lines of code," or about 1,500 lines per day. Apple announced new machine-learning tools in June 2017 and he sought to use them to create an "on-device coaching system" featuring "fatigue detection." He "spent substantial amounts of time coding and testing this innovation and applying for a patent . . . that has been since implemented in the Bike+ app." He started collecting real-world test data in August 2018. Around June 2019, he was nearing completion of a new app, but Apple announced a new Apple Watch operating system that enabled

---

[2] Mattis Decl. – ECF No. 137-3 at 3 (¶ 8), 4–5 (¶¶ 14–15), 6 (¶ 22).

[3] Def.'s Opp'n – ECF No. 147-2 at 12 (citing evidence under seal).

[4] Mattis Dep. – ECF No. 148-3 at 21 (p. 192:13–15), 30–32 (pp. 254:9–256:5), 37–38 (pp. 299:15–300:25), 40–42 (pp. 328:3–330:9).

[5] Mattis Dep. – ECF No. 136-10 at 31 (p. 462:1–14).

apps to run independently of a companion iPhone. This required a change in development for Mr. Mattis. He again neared completion by late 2019, but in early 2020 Apple released "StoreKit for Watch apps," which "would at least theoretically permit World Champ Tech to alter its distribution model to provide for an in app coaching feature for which subscription fees could be charged." Mr. Mattis began incorporating StoreKit and then "the COVID pandemic struck, impacting development productivity." He made certain other source-code edits in February 2020. As he prepared for final testing in mid-July 2020, Apple released a new operating system that introduced a bug; on September 2, 2020, he reported this bug to Apple. Another operating-system release occurred in November 2020, and after an inquiry from Mr. Mattis, Apple confirmed on December 3, 2020 that the bug was fixed. Mr. Mattis completed final testing and submitted the new Bike+ app to Apple for review on December 21, 2020. The new app then launched in January 2021.[6]

Aside from developing the new app, Mr. Mattis declares that the plaintiff engaged in other commercial activities during the period from 2016 to 2020. This included (1) "[w]ebsite promotion of the app," (2) Facebook accounts and advertising campaigns until 2019, (3) "agreement to the Apple Developer Program License Agreement and payment of the required, annual $99 developer license fee," (4) agreement to "the Apple Paid Applications Agreement, which allowed [the plaintiff] to include paid features in [its] apps" and entailed periodic pricing updates (for example, due to changes in currency-exchange rates), (5) "[c]ompliance with the requirements for export under U.S. Department of Commerce policy for software using encryption," (6) membership in "the Apple App Store Small Business Program," under which "Apple provides marketing support to small developers, including presentation of apps in responses to Internet search engines," and (7) "[p]ayment of a $450 monthly service fee . . . for the Heroku cloud data service that supports and maintains key functions of the 2014 Bike+ app."[7]

---

[6] Mattis Decl. – ECF No. 137-3 at 5–8 (¶¶ 16–29), 13 (¶¶ 40–41).

[7] *Id.* at 10–12 (¶ 37).

Some of this activity "occurred in support of international downloads and sales," but "[d]omestic downloads and sales of the Bike+ app continued throughout this time."[8]

Like the 2014 app, the 2021 app is for metric tracking while cycling.[9] Unlike the 2014 app, the 2021 app does not include "[bike more]" in its name, leaving only "Bike+," and the app logo says "Bike" rather than "b+." The 2021 app appears as follows in the Apple App Store:[10]



The 2021 app "shares significant code" with the 2014 app and "contains substantial code that descends from or extends the code of" the 2014 app.[11] Mr. Mattis testified that the 2021 app is functional for both indoor and outdoor bike rides.[12] It also has subscription coaching features.[13] But Mr. Mattis is "not positive" that the coaching features have ever worked since the 2021 app's launch. He "believed following the completion of testing that it would work."[14] The 2021 app was last updated in January 2022.[15]

Mr. Mattis is not aware of any in-app sales since the 2021 app's launch. He has posted about the app on social media but he has not encouraged others to post about it on social media.[16] He did not have a written business or marketing plan before launching the app, and he did not create

---

[8] *Id.* at 12 (¶ 38).

[9] App Store Preview – ECF No. 136-34 at 3.

[10] *Id.* at 2.

[11] Pl.'s 1st Am. Resp. to Def.'s 1st Set of Interrogs. – ECF No. 136-19 at 19–20 (Interrog. 6).

[12] Mattis Dep. – ECF No. 153-10 at 7–8 (pp. 560:22–562:5).

[13] App Store Preview – ECF No. 136-34 at 3.

[14] Mattis Dep. – ECF No. 136-10 at 35 (pp. 545:18–546:17).

[15] App Store Preview, Version History – ECF No. 136-34 at 5.

[16] Mattis Dep. – ECF No. 136-10 at 36 (pp. 563:12–564:8).

investor presentations, solicit investors, or raise capital.[17] He testified that with respect to marketing of the 2021 app, the plaintiff paid for one press release, sometime after the app's "soft launch."[18] He declares that "[c]onsistent with downscaling of expectations for the app" due to the defendant's alleged infringement, he has, "at a modest pace, posted regularly about [the plaintiff's] philosophy[] and the underlying technology and capabilities of the apps" on the plaintiff's website and on social media. "The Bike+ app regularly is featured in these comments."[19]

Mr. Mattis declares the total numbers, going back to the Bike+ app's launch in 2014 and broken down by year, of app downloads, subscribers, search impressions, Apple App Store page views, and app "sessions" (instances of users' opening the app after downloading it).[20]

## 2. The Plaintiff's Trademark

The plaintiff obtained a trademark registration for the Bike+ mark. It filed an intent-to-use application with the USPTO on November 23, 2013. It filed the statement of use in April 2014 and the mark was registered on July 28, 2015, with registration number 4,782,695.[21] The registration is for the following goods: "Downloadable mobile applications for recording and managing cycling activities, namely, the rider's average and maximum speed, rider's average and maximum power, heart rate, geographic route taken, outside air temperature, altercations with aggressive drivers, rider-entered route conditions, taking photos and uploading the same to an external computer server for personal review and viewing by others."[22]

After the plaintiff filed its trademark application, the USPTO cited a third party's prior filing for a "BIKEMORE" mark for bicycles. The plaintiff responded in March 2014, contending that its mark was not likely to cause consumer confusion. It distinguished between its software and the

---

[17] *Id.* at 32 (pp. 534:22–535:25).

[18] *Id.* at 3 (pp. 51:24–52:22).

[19] Mattis Decl. – ECF No. 137-3 at 16–17 (¶ 54).

[20] *Id.* at 14–15 (¶¶ 46–49) (under seal).

[21] *Id.* at 8 (¶ 31).

[22] Bike+ Trademark – ECF No. 136-13 at 2.

prior applicant's bicycles, pointing out that "[b]icycles are physical objects." The plaintiff also argued that because consumers who download an app first go through a selection process that takes several minutes, they are not likely to be confused.[23]

### 3.   The Defendant and its Bike+ Product Launch

The defendant, which was founded in 2012, is a home-fitness company that "bring[s] studio-style workouts into the home." Its first product was "an indoor stationary bike that replicates an in-studio experience." That bike was launched in 2013 and, among other features, has a "high-definition touchscreen with built-in stereo speakers to stream live and on-demand classes."[24]

The defendant now has about seven million members. Its "core brand" is the name Peloton. It conducted a survey finding that about 80% of the "general consuming public" have seen or heard of the Peloton brand. The defendant's products all feature that name. For example, the "Peloton Row" is a "connected-fitness rowing machine." The defendant also operates "more than [ninety] . . . brick-and-mortar retail showrooms throughout the United States."[25]

Over the years, the defendant has released new products. In 2018, it launched the Peloton App, a mobile app for members to do such things as stream Peloton's classes, track outdoor workouts, and sign up for classes.[26] The app enables Peloton subscribers to track metrics when working out, separately from any Peloton class, including when cycling.[27]

On September 8, 2020, the defendant announced that it would offer a "second, higher-end version" of its (indoor) connected bike and treadmill products. This was a "better/best" product strategy consisting of "two models: one a high-quality option and the other a premium, higher-priced option offering additional features." The premium models were given a plus sign in their name: "Peloton Bike+" and "Peloton Tread+." The Peloton Bike+ "offers features not found on

---

[23] Resp. to Off. Action – ECF No. 136-14 at 5–12.

[24] Cortese Decl. – ECF No. 135-2 at 2 (¶¶ 2–4).

[25] *Id.* at 3 (¶¶ 5–7); Horet Report – ECF No. 138-5 at 10.

[26] Cortese Decl. – ECF No. 135-2 at 3 (¶ 5).

[27] Dillon-Curran Dep. – ECF No. 137-35 at 4 (pp. 194:15–195:5).

United States District Court
Northern District of California

the original bike, including a larger, rotating screen" and "a resistance knob that automatically adjusts to the instructor's recommendations." It also offers integration with Apple Watches for metric tracking. Marketing expenditures for the product launch were substantial. The Peloton Bike+ costs up to $1,050 more than the original bike.[28]

The defendant "chose to append a '+' to 'Bike' because it is a simple term that consumers understand to signify a product line extension with added features. Numerous leading brands, such as Apple (Apple TV+) and Disney (Disney+), had already adopted '+' for their line expansions." Thus, the plus sign "can easily be implemented across product lines to indicate a 'better/best' product array."[29]

"All of Peloton's marketing materials that mention the term 'Bike+' are also branded with the [Peloton] mark." The defendant describes the Peloton mark as "distinctive" and as "typically" being "emphasize[d]" when its premium model's name is displayed. This is how the full name is "often" displayed:[30]



The defendant "is unaware of any instances of consumers confusing or making any connection between [the plaintiff] and [the defendant]." The defendant "has no plans to use the term 'Bike+'" other than with its "Peloton Bike+" model.[31]

Tom Cortese, the defendant's co-founder and Chief Product Officer, did not learn of the plaintiff and its mobile applications until after the filing of this case. His understanding is that "the other members of the marketing team and executive team that were involved in conceiving and adopting the naming convention were also unaware of [the plaintiff] and its mobile applications prior to the

---

[28] Cortese Decl. – ECF No. 135-2 at 3–4 (¶¶ 8–12); Feature Comparison – ECF No. 137-49 at 3–4; Brennan Dep. – ECF No. 137-44 at 5 (pp. 120:24–121:20) (providing an estimated minimum amount of marketing expenditures) (under seal).

[29] Cortese Decl. – ECF No. 135-2 at 4–5 (¶¶ 14–16).

[30] Id. at 6 (¶¶ 22–23).

[31] Id. at 5 (¶¶ 19–20).

United States District Court
Northern District of California

filing of this lawsuit." Members of the defendant's in-house legal team "became aware of [the plaintiff] and its trademark registration for a mobile cycling app during the clearance process."[32] Specifically, Peloton in-house counsel learned of the trademark in October 2019 and then communicated with outside counsel, who provided an opinion on the subject in November 2019.[33]

### 4. The Plaintiff's Actions After the Defendant's Bike+ Product Launch

The plaintiff first discovered Peloton's Bike+ product when it was released in September 2020.[34] The following occurred after that discovery.

As already described, the plaintiff's 2021 app (which was already in development for a while) launched after that time: "[o]n December 3, 2020, [the plaintiff] received notice from Apple" that a bug reported by the plaintiff on September 2, 2020 had been fixed. "This bug had prevented the submission and lunch, prior to September 2, 2020, of the new . . . mobile applications that [the plaintiff] later launched." The plaintiff submitted the new app to Apple on December 21, 2020.[35]

On December 1, 2020, the plaintiff renewed its trademark registration and filed a declaration of incontestability. The renewal included an air-temperature-measurement feature even though at that time, it was "highly likely, perhaps certain, that the temperature feature did not work." Mr. Mattis declares that the reason it did not work was because it "depended on a feed from Weather Underground" that was no longer operational, and that he "cannot remember whether [he] knew at the time [he] renewed the registration that Weather Underground was no longer supporting the feed."[36]

In March 2021, the plaintiff produced new videos "for use in marketing and customer support in connection with" its 2021 app. In April 2021, it "took steps to design and develop a new website for use at the domain name worldchamptech.com, prepare content for such website

---

[32] *Id.* at 5 (¶ 18).

[33] Dillon-Curran Dep. – ECF No. 137-38 at 4 (pp. 184:16–185:25).

[34] Mattis Decl. – ECF No. 137-3 at 15 (¶ 50).

[35] Pl.'s 1st Am. Resp. to Def.'s 1st Set of Interrogs. – ECF No. 136-19 at 6 (Interrog. 3).

[36] Mattis Decl. – ECF No. 137-3 at 10 (¶ 36).

(including writing blog posts that were later posted to the website on May 3 and 4, 2021), and transfer it to a new hosting service."[37]

As of September 2020, the plaintiff's LLC status was suspended due to its failure to pay taxes since 2015.[38] "From February 2021 through April 2021, [the plaintiff] took steps to correct" this tax-filing "oversight."[39]

The parties' pre-lawsuit contact began on December 2, 2020: the plaintiff's lawyer "wrote to raise its rights with [the defendant] and invite a discussion." The parties held discussions on January 4, 2021, and the defendant solicited further discussions later that month, but the plaintiff elected not to respond substantively. Mr. Mattis "took stock of the resources that would be necessary and then helped counsel investigate the claims and prepare a complaint." On April 30, 2021, the plaintiff filed the complaint.[40]

Mr. Mattis declares that the plaintiff "filed suit as soon as [he] felt it was reasonably practical." "Just before filing suit, to help decide whether to sue, [Mr. Mattis] created an analysis . . . based on [his] own lay understanding of the rules." He sent this analysis to his girlfriend "to check [his] assumptions," and he "was not intending to indicate that [he] expected [the plaintiff] to recover huge sums of money." He was not "acting opportunistically to take advantage of [the defendant's] decision to infringe." Overall, the plaintiff's actions were allegedly consistent with plans "to sell apps under a [Bike+] trademark."[41]


**5. Procedural History**

The complaint has six claims: (1) federal trademark infringement, 15 U.S.C. § 1114; (2) federal unfair competition, 15 U.S.C. § 1125(a); (3) California unfair competition, Cal. Bus. & Prof. Code § 17200; (4) California false advertising, Cal. Bus. & Prof. Code § 17500; (5)

---

[37] Pl.'s 1st Am. Resp. to Def.'s 1st Set of Interrogs. – ECF No. 136-19 at 7 (Interrog. 3).

[38] Mattis Dep. – ECF No. 136-10 at 31 (p. 462:1–14).

[39] Pl.'s 1st Am. Resp. to Def.'s 1st Set of Interrogs. – ECF No. 136-19 at 7 (Interrog. 3).

[40] Mattis Decl. – ECF No. 137-3 at 15–16 (¶¶ 50–51).

[41] *Id.* at 16 (¶ 53).

United States District Court
Northern District of California

common-law trademark infringement; and (6) common-law unfair competition. All claims are based on the defendant's alleged "willful and unauthorized use of [the plaintiff]'s trademark."[42] The parties stipulated that the plaintiff's claims are limited to "the theory that [the defendant]'s conduct is likely to cause reverse confusion, not forward confusion."[43]

The court has federal-question jurisdiction. 28 U.S.C. §§ 1331, 1338. All parties consented to magistrate-judge jurisdiction.[44] *Id.* § 636(c). The court held a hearing on May 25, 2023.

## STANDARD OF REVIEW

The court must grant summary judgment where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248–49.

The party moving for summary judgment has the initial burden of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting

---

[42] Compl. – ECF No. 1 at 1 (¶ 1), 12–20 (¶¶ 70–113).

[43] Joint Case-Mgmt. Statement – ECF No. 130 at 2.

[44] Joint Consent – ECF No. 102.

United States District Court
Northern District of California

*Celotex*, 477 U.S. at 325). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

If the moving party meets its initial burden, then the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1103. "Once the moving party carries its initial burden, the adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but must provide affidavits or other sources of evidence that set forth specific facts showing that there is a genuine issue for trial." *Devereaux*, 263 F.3d at 1076 (cleaned up). If the non-moving party does not produce evidence to show a genuine issue of material fact, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 322–23.

In ruling on a motion for summary judgment, the court does not make credibility determinations or weigh conflicting evidence. Instead, it views the evidence in the light most favorable to the non-moving party and draws all factual inferences in the non-moving party's favor. *E.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991).

## ANALYSIS

The defendant moved for summary judgment on the ground that consumers are not likely to be confused about the source of the plaintiff's app.[45] That argument, if correct, would resolve all of the plaintiff's claims because they all turn on the same likelihood-of-confusion analysis. *M2 Software, Inc. v. M2 Commc'ns, L.L.C.*, 281 F. Supp. 2d 1166, 1169 (C.D. Cal. 2003). The court grants summary judgment on this ground.

---

[45] Def.'s Mot. – ECF No. 135.

1. **Legal Standard**

The United States Trademark Act (Lanham Act) prohibits the unauthorized use in commerce of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark" where such use is likely to cause confusion, to cause mistake, or to deceive. 15 U.S.C. § 1114(1)(a). To prevail on a claim for relief, a plaintiff must prove "(1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion, thereby infringing upon the [plaintiff's] rights to the mark." *Dep't of Parks & Recreation for Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006); *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1085 (9th Cir. 2005) (the plaintiff "must show sufficient evidence to permit a rational trier of fact to find that confusion is probable, not merely possible") (cleaned up).

Courts consider eight factors to determine the likelihood of confusion:

> (1) [S]trength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.

*Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008). The factors are pliant, and the Ninth Circuit has warned against "excessive rigidity" in their application. *Id.* at 632–33. Instead, "[t]he test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005). Indeed, "[n]either intent nor actual confusion is necessary to establish a likelihood of confusion." *Chanel, Inc. v. Dudum*, No. C-12-01966 JCS, 2012 WL 5833562, at *4 (N.D. Cal. Oct. 29, 2012), *R. & R. adopted*, No. C 12-1966 CRB, 2012 WL 5835694 (N.D. Cal. Nov. 15, 2012). That said, "some factors — such as the similarity of the marks and whether the two companies are direct competitors — will always be important." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999).

This is a reverse-confusion case where "consumers dealing with a senior trademark-holder" (the party that first used the mark, which here is the plaintiff) are allegedly confused because they believe "that they are doing business with a junior user" (here, the defendant). *M2 Software*, 421 F.3d at 1079; *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1159–60 (9th Cir. 2021)

United States District Court
Northern District of California

(describing reverse confusion in more detail). That is, "reverse confusion occurs when a person who knows only of the well-known junior user comes into contact with the lesser-known senior user, and because of the similarity of the marks, mistakenly thinks that the senior user is the same as or is affiliated with the junior user." *Ironhawk Techs.*, 2 F.4th at 1160. These cases change the likelihood-of-confusion analysis for certain factors, as explained in more detail below.

"Because of the 'intensely factual nature of trademark disputes,' summary judgment is generally disfavored in trademark cases and should be granted 'sparingly.'" *Monster, Inc. v. Dolby Lab'ys Licensing Corp.*, 920 F. Supp. 2d 1066, 1070–71 (N.D. Cal. 2013) (quoting *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202, 1210 (9th Cir. 2012)). "[C]areful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record." *Rearden LLC*, 683 F.3d at 1210 (cleaned up). Still, summary judgment is appropriate when "[t]he distribution of the *Sleekcraft* factors does not raise a material issue of fact regarding likelihood of confusion." *Surfvivor*, 406 F.3d at 634.

## 2. Application

The court first addresses a threshold issue, which is the defendant's argument that the plaintiff's 2014 and 2021 apps are distinct and the latter is not relevant because it was not a bona fide commercial use of the plaintiff's mark.[46]

"[A] senior user's post-infringement use of the mark on additional products" should sometimes be excluded from likelihood-of-confusion analysis. *Lodestar Anstalt v. Bacardi & Co.*, 31 F.4th 1228, 1252–53 (9th Cir. 2022). Specifically, "the Lanham Act generally limits enforceable trademark rights to bona fide uses that reflect genuine commercial endeavors rather than merely efforts to retain rights in a mark." *Id.* at 1254 (cleaned up) (citing 15 U.S.C. § 1127). Thus, "the statute requires commercial use of the type common to the particular industry in question" — use that is "for genuine commercial reasons" and is not a "'token' or other insubstantial use[]." *Id.* at 1255 (cleaned up). But "[a] single sale, or non-sales activities alone,

---

[46] Def.'s Mot. – ECF No. 135 at 29–32.

United States District Court
Northern District of California

may suffice to merit trademark protection upon review of the totality of the circumstances." *Soc. Techs. LLC v. Apple Inc.*, 4 F.4th 811, 821 n.11 (9th Cir. 2021).

Here, the plaintiff's 2021 app was in continuous (if slow paced) development before and after the launch of the Peloton Bike+. Also, the "2021 app" was in a sense an update to the plaintiff's existing use in commerce (its 2014 Bike+ app). This is unlike cases where a product launch was merely a reaction to an allegedly infringing product launch, for the purpose of reserving trademark rights. *Compare Lodestar*, 31 F.4th at 1255 (the plaintiff had decided to suspend a rum project but then reactivated it after the defendant's allegedly infringing product campaign began; after an initial sale, only sixteen sample bottles were delivered over the next five years; "a reasonable jury . . . could conclude" that the project was a bona fide use), *with Soc. Techs.*, 4 F.4th at 819–22 (the plaintiff's app was not a bona fide use because after filing its trademark application, the plaintiff did not even develop code for its "Memoji" app until Apple released a similar app, at which point the plaintiff "rushed to develop the code for and release its [app]"). It is true that the 2021 iteration of the plaintiff's app has arguably been less than robust: for example, there have been no in-app sales, the app's distinguishing "coaching" feature may not be functional, marketing has been limited, and the app was last updated in January 2022. But viewing the evidence in the light most favorable to the plaintiff, and especially in light of *Lodestar*, there is a genuine dispute that the 2021 app is a bona fide commercial use.

The issue then is whether, considering both the 2014 and 2021 apps, the *Sleekcraft* analysis entitles the defendant to summary judgment on the plaintiff's claims for liability. With the knowledge that "this inquiry [is] exhausting," *Ironhawk Techs.*, 2 F.4th at 1161, the court begins at the beginning.

The strength of the mark is an important factor. A party that chooses "a common, useful, and descriptive term as a trademark" will not get "the same broad scope of protection that may be accorded to more distinctive and arbitrary marks." *Redken Lab'ys, Inc. v. Clairol, Inc.*, 501 F.2d 1403, 1405 (9th Cir. 1974). "This 'strength' of the trademark is evaluated in terms of its conceptual strength and commercial strength." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). In reverse-confusion cases, the court compares the conceptual strength of the

plaintiff's mark to the commercial strength of the defendant's mark. *Ironhawk Techs.*, 2 F.4th at 1162. "[T]he important question . . . is whether the [defendant's] junior mark is so [commercially] strong as to overtake the senior mark." *Id.* (cleaned up). Thus, a reverse-confusion plaintiff "with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark, and this is particularly true when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark." *Id.* at 1162–63 (cleaned up).

With respect to conceptual strength, "[f]rom weakest to strongest, marks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful." *GoTo.com*, 202 F.3d at 1207. Parties often dispute "how marks in the middle, not so plainly descriptive, nor so plainly distinctive, should be categorized." *Ironhawk Techs.*, 2 F.4th at 1162. Suggestive marks "suggest a product's features and require consumers to exercise some imagination to associate the suggestive mark with the product." *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1107 (9th Cir. 2016). Descriptive marks "define a particular characteristic of the product in a way that does not require any imagination." *Id.* "[T]he question [on summary judgment] is whether a reasonable jury could find that [the] mark is at least suggestive[.]" *Ironhawk Techs.*, 2 F.4th at 1162. But "the line between descriptive and suggestive marks is elusive" and "is a question of fact." *Id.* (cleaned up).

Commercial strength, on the other hand, "is based on actual marketplace recognition." *JL Beverage*, 828 F.3d at 1107 (cleaned up). This can be shown "by such factors as extensive advertising, length of exclusive use, public recognition and uniqueness." *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1536 (9th Cir. 1989).

The first question is whether the plaintiff's Bike+ mark is suggestive rather than descriptive. In this analysis, it matters that the plaintiff has a federal trademark registration. The parties do not dispute that the mark was registered without proof of secondary meaning, which is an "acquired distinctiveness" that is required for a descriptive mark to become protectable. *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010). When a mark is registered without proof of secondary meaning, the mark holder is "entitled to a presumption that the mark is inherently distinctive — i.e., suggestive — and the burden shift[s] to [the defendant] to show that the mark is 'merely descriptive' by a preponderance of the evidence." *Id.* at 1115. If the defendant

United States District Court
Northern District of California

1   can do so "through law, undisputed facts, or a combination thereof," the plaintiff "cannot survive

2   summary judgment." *Id.* But this is a "heavy" burden for the defendant and because the defendant

3   is the moving party, the plaintiff "gets the benefit of reasonable inferences." *Id.*

4        This is the rare case where the court can decide as a matter of law that the plaintiff's mark is

5   descriptive. No imagination is needed to understand from the "Bike+" mark and its context in the

6   marketplace that the plaintiff's product is an app for enhancing biking. *Entrepreneur Media, Inc.*

7   *v. Smith*, 279 F.3d 1135, 1142 (9th Cir. 2002) ("Whether a mark suggests or describes the goods

8   or services of the trademark holder depends . . . upon what those goods or services are. We

9   therefore adjudge a mark's strength by reference to the goods or services that it identifies[] and as

10  it appears in the marketplace.") (cleaned up); *Zobmondo Ent.*, 602 F.3d at 1116 ("Our prior

11  precedent makes it clear that merely descriptive marks need not describe the 'essential nature' of a

12  product; it is enough that the mark describe some aspect of the product."). In *Entrepreneur Media*,

13  for example, the court held that the mark "Entrepreneur," as applied to the plaintiff's magazines

14  and computer programs and manuals, was descriptive. 279 F.3d at 1142 (summary-judgment

15  stage); *see also Plus Prods. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir. 1983) ("The

16  term Plus is an everyday word that indicates something added, and when applied to goods, it

17  merely implies additional quantity or quality."). "Bike+" is likewise descriptive.

18       The plaintiff's mark is further weakened by the presence of similar marks for similar apps in

19  the major app stores. *Lodestar*, 31 F.4th at 1259 n.11 ("[e]vidence of third-party use of a similar

20  mark is relevant to the strength of the mark," including "for the . . . purpose of showing that the

21  [plaintiff's mark] has been repeatedly associated with [similar] products"). The defendant

22  submitted evidence of nine other apps in the Apple App Store and the Google Play Store using

23  variants of "Plus" or "+" along with "Bike."[47] The plaintiff responds that it "challenged several of

24  these and the use, if any, stopped,"[48] but that does not account for all of them and the fact remains

25  that "the [plaintiff's mark] has been repeatedly associated with [similar] products." *Id.*

26

27  _____

[47] Hoyer Report – ECF No. 136-44 at 14 (¶ 44); Google Play Store Page – ECF No. 162-4 at 3.

28  [48] Pl.'s Opp'n – ECF No. 149 at 28 & n.4.

United States District Court
Northern District of California

1    On the mark-strength factor, though, "[w]hether [the senior mark is] descriptive or suggestive,

2  the important question in a reverse confusion case is whether the junior mark is so commercially

3  strong as to overtake the senior mark." *Ironhawk Techs.*, 2 F.4th at 1162 (cleaned up). In *Ironhawk*

4  *Techs.*, the plaintiff's mark was conceptually weak but the court held that given the evidence of

5  the junior mark's commercial strength, the overall mark-strength issue was for the jury to decide.

6  *Id.* at 1163.

7    Nonetheless, the parties dispute whether the plaintiff's mark's reputation or "commercial

8  strength" might matter for the mark-strength factor in a reverse-confusion case. (Recall that under

9  Ninth Circuit precedent, in reverse-confusion cases the court compares the conceptual strength of

10  the plaintiff's mark to the commercial strength of the defendant's mark.) The defendant relies on

11  *Aliign Activation Wear, LLC v. lululemon athletica Canada Inc.* for the proposition that the senior

12  mark must have more than de minimis goodwill, i.e., it must have some commercial strength for

13  the junior mark to overtake.[49] No. 220CV03339SVWJEM, 2021 WL 3117239, at *11 (C.D. Cal.

14  June 7, 2021) ("[T]o survive summary judgment on a reverse confusion claim, [the plaintiff] must

15  raise a genuine issue of material fact that an appreciable number of consumers believe they are

16  purchasing [the defendant's] products when they are, in fact, purchasing [the plaintiff's]

17  products.") (citing *Surfvivor Media*, 406 F.3d at 630), *aff'd*, No. 21-55775, 2022 WL 3210698 (9th

18  Cir. Aug. 9, 2022). In *Aliign*, the court noted that "hardly anyone" purchased the plaintiff's yoga

19  clothing: the plaintiff had sold seven items "from 2015 onwards." *Id.* The court thus held that "no

20  reasonable juror could find an *appreciable number* of consumers are likely to be confused and

21  believe they are buying lululemon." *Id.*

22    In its unpublished decision affirming *Aliign*, the Ninth Circuit did not address the mark-

23  strength factor or the district court's "appreciable number" reasoning. 2022 WL 3210698, at *1–2.

24  Aside from the *Aliign* district court's decision, it is possible to find some other support for the

25  notion that the plaintiff's junior mark must have some degree of commercial strength for there to

26  be reverse confusion. *See Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th

27

28  ---
[49] Def.'s Mot. – ECF No. 135 at 24–25.

1    Cir. 1998) ("Dreamwerks notes that whatever goodwill it has built now rests in the hands of

2    DreamWorks; if the latter should take a major misstep and tarnish its reputation with the public,

3    Dreamwerks too would be pulled down."); *Ironhawk Techs.*, 2 F.4th at 1160 (describing the senior

4    user in a reverse-confusion case as known to some degree and stating that reverse confusion

5    occurs when a consumer "mistakenly thinks that the senior user is the same as or is affiliated with

6    the junior user"); *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 228 (3d

7    Cir. 2000) ("The chief danger inherent in recognizing reverse confusion claims is that innovative

8    junior users, who have invested heavily in promoting a particular mark, will suddenly find their

9    use of the mark blocked by plaintiffs who have not invested in, or promoted, their own marks.").

10        Certainly, it is important that the Ninth Circuit's reverse-confusion test compares the senior

11    mark's conceptual strength to the junior mark's commercial strength. *Ironhawk Techs.*, 2 F.4th at

12    1162–63. And here, the defendant's mark's commercial strength is significant compared to the

13    plaintiff's mark's conceptual strength. What about when the plaintiff's mark is descriptive,

14    though? *Id.* at 1162 ("On summary judgment . . . the question is whether a reasonable jury could

15    find that [the plaintiff's] mark is at least suggestive."). Or when the plaintiff's mark is both

16    descriptive and commercially weak? The Ninth Circuit has assumed that the plaintiff's mark's

17    commercial strength must meet some minimum bar. *Id.* at 1163 ("[W]e assess the commercial

18    strength of [the defendant's] mark and ask whether it is able to swamp the reputation of [the

19    plaintiff's mark] with a much larger advertising campaign.").

20        To the extent the plaintiff's mark's commercial strength is relevant, there was not much of it

21    for the defendant's mark to overtake in this case. The current version of the plaintiff's app

22    (discussed above as the "2021 app") was under development for a very long time before the

23    defendant's product launch (with an associated lack of development or promotion of the 2014

24    app), was last updated in January 2022, has achieved no in-app sales, showed declining (and

25    insubstantial) subscriber numbers, has been marketed minimally, and has a key feature that may

26    not be functional. Under these circumstances — where besides being commercially weak, the

27    plaintiff's mark is (as a matter of law) descriptive — the mark-strength factor favors the

28    defendant. The court revisits this issue in its recap of the *Sleekcraft* factors below, though.

United States District Court
Northern District of California

The next factor (which is also an important one) is whether the parties are direct competitors or, put another way, "the relatedness of the products and services offered." *Brookfield Commc'ns*, 174 F.3d at 1055. "Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Id.* In this "competitive proximity" analysis, the court asks whether "the products are used for similar purposes" and whether "the two companies compete for the patronage of an overlapping audience." *Id.* Stated differently, "[t]he proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011). But "the mere fact that two products or services fall within the same general field" is not enough. *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1050 (C.D. Cal. 2013); *Brookfield Commc'ns*, 174 F.3d at 1056 (the focus is on the parties' products rather than their "principal lines of business").

Although the defendant's product is a $2500 stationary bike and the plaintiff's is an app, they are complementary: the defendant offers a metric-tracking app to accompany its bike, and the plaintiff's app can be used with indoor stationary bikes. *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 132 (11th Cir. 2022) (record evidence of the potential for cross-compatibility, in the form of equivalent cross-compatibility already existing in the market, shows product relatedness). For the same reason, there is at least a genuine dispute that the products are sold to the same class of purchasers and are similar in use and function. This factor thus favors the plaintiff.

The third factor, which again is important, is the similarity of the marks. This analysis "rel[ies] on three general principles." *Ironhawk Techs.*, 2 F.4th at 1164. "First, similarity is best adjudged by appearance, sound, and meaning." *Id.* (cleaned up). "Second, the marks must be considered in their entirety and as they appear in the marketplace." *Id.* (cleaned up); *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984) ("The two marks viewed in isolation are . . . identical, but their similarity must be considered in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase of the [products]."); *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1080–81 (9th Cir. 2020) ("[N]o reasonable consumer would be confused by these two products because the packaging, size, color, shape, and all other

attributes . . . are not remotely similar."). "Third, similarities are weighed more heavily than differences." *Ironhawk Techs.*, 2 F.4th at 1164 (cleaned up).

The defendant's use of its "business name or house mark alongside its version of the disputed mark" is important for this factor. *Id.* "[I]n a reverse confusion case[,] the junior user's use of a house mark can . . . aggravate confusion by reinforcing the association between the mark and the junior user." *Id.*; *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1288 (9th Cir. 1992).

Despite differences in how the marks have been encountered in the marketplace at times (for example, the plaintiff's mark's being encountered in an app store with "bike more" next to it), in the specific context of reverse confusion, the defendant's use of its housemark means that "a reasonable jury could find that the marks are similar." *Ironhawk Techs.*, 2 F.4th at 1165; *Americana Trading*, 966 F.2d at 1288 (due to "the prominence of [the defendant]'s housemark," the district court "erred by finding no genuine issue of material fact as to similarity of appearance, sound, and meaning"). This factor favors the plaintiff.

The fourth factor is whether there is evidence of actual confusion. *Jada Toys*, 518 F.3d at 632. Although the parties offered competing expert surveys on whether consumers would be confused and the parties dispute (essentially) the weight those reports should be given, it is undisputed that no evidence of actual confusion has been offered. Given that the parties' products have coexisted in the marketplace since September 2020, the lack of evidence of actual confusion weighs in the defendant's favor at the summary-judgment stage. *Lodestar*, 31 F.4th at 1261; *Cohn v. Petsmart, Inc.*, 281 F.3d 837 at 842–43 (9th Cir. 2002).

The next factor — the marketing channels used by the parties — also weighs in the defendant's favor.

"Convergent marketing channels increase the likelihood of confusion." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993) (cleaned up). "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014). The ultimate question is whether "the general class of . . . purchasers

exposed to the products overlap." *Id.* (cleaned up); *see Ironhawk Techs.*, 2 F.4th at 1166 ("[B]oth [parties'] employing salespeople is of little significance without evidence those salespeople target the same class of customers."). If both parties engage in "generic internet advertising," though, that is insignificant because "most companies today engage in online marketing." *See, e.g.*, *Asuragen, Inc. v. Accuragen, Inc.*, No. 16-cv-05440-RS, 2018 WL 558888, at *6 (N.D. Cal. Jan. 25, 2018).

The defendant emphasizes that it sells its Bike+ product "exclusively through [its] showrooms and website[] and through [Dick]'s Sporting Goods' stores and website."[50] Also, the summary-judgment evidence is that the plaintiff has not done much marketing: the last Facebook advertising for the 2014 app was in 2019 (before the defendant's product launch), and marketing for the 2021 app has been limited. The plaintiff counters that the defendant's advertising "has swamped all channels with [Bike]+ advertising" (and thus occupies the channels used by the plaintiff, such as "the Apple App Store, search engines, and social media") and that the parties' marketing experts "describe a long sales funnel in which consumers interested in Peloton's Bike+ are likely exposed to multiple Bike+ impressions in multiple channels before they buy."[51]

The parties' marketing channels are not convergent. For one thing, the fact that the defendant's substantial advertising campaign encompasses the Apple App Store and internet search engines is unremarkable under the precedent. Moreover, the plaintiff has done very little marketing during the products' coexistence (i.e., from September 2020 onwards), meaning that the parties' marketing channels have not themselves exposed a meaningful overlap of consumers to the products. *Helix Env't Plan., Inc. v. Helix Env't & Strategic Sols.*, No. 3:18-cv-2000-AJB-AHG, 2020 WL 2556341, at *6 (S.D. Cal. May 20, 2020) (one party did "very little marketing" and instead "advertise[d] primarily through word-of-mouth," so the court "conclude[d] that this factor favor[ed] Defendants"). The defendant's use of brick-and-mortar stores further separates its marketing channels from the plaintiff's. Thus, this factor favors the defendant significantly.

---

[50] Cortese Decl. – ECF No. 135-2 at 6 (¶ 21).

[51] Pl.'s Opp'n – ECF No. 149 at 29–30 (citing summary-judgment evidence, including expert depositions).

The sixth factor is "the type of goods and the degree of care likely to be exercised by the purchaser." *Jada Toys*, 518 F.3d at 632. Courts "assess the sophistication of the customers and ask whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Ironhawk Techs.*, 2 F.4th at 1167 (cleaned up). "In a reverse confusion case, the degree of care exercised by customers is determined with reference to the alleged senior user's customers only." *Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629, 634 n.2 (9th Cir. 2007) (cleaned up).

"When the buyer has expertise in the field, or the goods are expensive, the buyer can be expected to exercise greater care in his purchases." *Ironhawk Techs.*, 2 F.4th at 1167 (cleaned up). In this regard, consumers "in specialized, niche markets may be very sophisticated as to brands and discerning in their purchases. Possible examples could include buyers of mountain climbing equipment and buyers of tap dance shoes." 4 McCarthy on Trademarks and Unfair Competition § 23:99 (5th ed. Dec. 2023 Update). Thus, district courts have held that buyers exercise greater care when choosing products related to fitness and health. *Suja, Life, LLC v. Pines Int'l, Inc.*, No. 16CV985-GPC(WVG), 2016 WL 6157950, at *12 (S.D. Cal. Oct. 24, 2016) ("Consumers choosing products that affect their physical appearance and health are likely to exercise a great deal of care.") (cleaned up); *Reeves v. Gen. Nutrition Ctrs., Inc.*, No. SACV1001653JAKFFMX, 2012 WL 13018362, at *7 (C.D. Cal. Apr. 2, 2012) (similar); *Jevo Inc. v. Barre Physique LLC*, No. CV-08-06315-R, 2010 WL 11597823, at *20 (C.D. Cal. Feb. 22, 2010) (similar). At the same time, the Ninth Circuit has said that "a discerning consumer might immediately connect the like-named products more readily than an unsophisticated consumer." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1038 (9th Cir. 2010).

Here, the plaintiff does not dispute that its customers are sophisticated with respect to connected-fitness products. Instead, the plaintiff relies on the proposition that their sophistication increases the likelihood of confusion.[52] The Ninth Circuit's statement to that effect in *Fortune Dynamic* was in the context of "the difficulty of trying to determine with any degree of confidence

---

[52] Pl.'s Opp'n – ECF No. 149 at 32–33.

United States District Court
Northern District of California

the level of sophistication of young women shopping at Victoria's Secret," which "only confirm[ed] the need for [the] case to be heard by a jury." *Id.* By contrast, there is longstanding precedent that consumer sophistication (at least when known) "can be expected" to result in consumers' using "greater care in [their] purchases." *Ironhawk Techs.*, 2 F.4th at 1167. This precedent applies in the online context as well. *Network Automation*, 638 F.3d at 1150 ("[T]he default degree of consumer care [online] is becoming more heightened as the novelty of the Internet evaporates and online commerce becomes commonplace."). The purchaser-care factor thus favors the defendant because the plaintiff's customers can be expected to exercise greater care when browsing the Apple App Store.

The court next considers the defendant's intent in selecting its mark. *Jada Toys*, 518 F.3d at 632. "Evidence that a defendant has an 'intent to deceive' customers weighs in favor of finding a likelihood of confusion." *Fortinet, Inc. v. Fortanix, Inc.*, No. 20-cv-06900-MMC, 2022 WL 1128723, at *5 (N.D. Cal. Apr. 15, 2022). But "when a court applies *Sleekcraft* in a case that presents reverse confusion," it "may consider several indicia of intent," bearing in mind that "[t]he *Sleekcraft* factors are to be applied flexibly." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017). "At one extreme, intent could be shown through evidence that a defendant deliberately intended to push the plaintiff out of the market by flooding the market with advertising to create reverse confusion." *Id.* "Intent could also be shown by evidence that, for example, the defendant knew of the mark, should have known of the mark, intended to copy the plaintiff, failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion." *Id.* at 934–35; *Ironhawk Techs.*, 2 F.4th at 1167–68 ("In the reverse confusion context, we ask whether there is some evidence that the junior user, when it knew of the senior user, was at fault for not adequately respecting the rights of the senior user.") (cleaned up). "[B]ut no specific type of evidence is necessary to establish intent, and the importance of intent and evidence presented will vary by case." *Marketquest Grp.*, 862 F.3d at 935.

The defendant admits that its in-house counsel knew of the plaintiff's mark before the defendant's Bike+ product launch and that its in-house counsel obtained an opinion from outside

counsel on the subject at that time.[53] The plaintiff contends that this scenario shows that the defendant "culpably disregarded the risk of reverse confusion."[54] It is true that the defendant at least should have known of the plaintiff's mark at the time of the defendant's product launch. But especially given that "Bike+" is a descriptive mark, the defendant's choice of a product name that likewise describes its product mitigates the significance of the intent factor. *Edge Games, Inc. v. Elec. Arts, Inc.*, 745 F. Supp. 2d 1101, 1116 (N.D. Cal. 2010) (in a reverse-confusion case, "there [was] no evidence in the record that EA chose to call [its] product 'Mirror's Edge' for any reason but to describe the visual and thematic aspects of the video game," and relatedly, "the 'strength' of plaintiff's asserted marks [was] also highly susceptible to attack"). The court thus concludes that this factor is neutral or very slightly in the plaintiff's favor.

The final factor — the likelihood of expansion of the parties' product lines — is treated by the parties as insignificant in their briefs. This factor is more important "[i]n the context of non-competing goods" (unlike the complementary products at issue here). *Ironhawk Techs.*, 2 F.4th at 1168 ("[A] strong possibility that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing.") (cleaned up). The plaintiff did submit evidence that the defendant has considered developing an app store for its fitness equipment and has applied for trademark registrations related to mobile app features.[55] Some cases, though, have described the likelihood-of-expansion test as whether "the plaintiff's expansion plans" are being hindered. *Surfvivor*, 406 F.3d at 634. If anything, this factor favors the plaintiff very slightly, but the factor's significance is diminished here.

Having walked through each factor, the court's final task is to evaluate the totality of the circumstances. *Ironhawk Techs.*, 2 F.4th at 1169. To survive summary judgment, "the plaintiff

---

[53] Cortese Decl. – ECF No. 135-2 at 5 (¶ 18); Dillon-Curran Dep. – ECF No. 137-38 at 4 (pp. 184:16–185:25).

[54] Pl.'s Opp'n – ECF No. 149 at 31.

[55] Feb. 2022 New York Times Article – ECF No. 150-18 at 3–4 (the defendant's CEO floated the idea of creating an app store to run on the equipment's screen); Trademark Registration – ECF No. 152-40 at 2–3 (registration for the mark "Peloton" for (among other things) "downloadable software in the nature of an application for use by individuals participating in exercise classes [and] physical training").

United States District Court
Northern District of California

need not satisfy every factor, provided that strong showings are made with respect to some of them." *Surfvivor*, 406 F.3d at 631. That said, the *Sleekcraft* "list does not purport to be exhaustive, and non-listed variables may often be quite important." *Brookfield Commc'ns*, 174 F.3d at 1054. The ultimate question is whether "a rational trier of fact could find that confusion is probable." *Ironhawk Techs.*, 2 F.4th at 1167.

Although the court's task is not to "count beans," *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1076 (9th Cir. 2006), a recap of the court's conclusions will be helpful. The following *Sleekcraft* list shows which factors are the "important" ones and which party each one favors:

> (1) strength of the marks (important): Defendant
>
> (2) relatedness of the goods (important): Plaintiff
>
> (3) similarity of the marks (important): Plaintiff
>
> (4) evidence of actual confusion: Defendant
>
> (5) marketing channels: strongly Defendant
>
> (6) degree of consumer care: Defendant
>
> (7) intent to deceive: neutral or very slightly Plaintiff
>
> (8) likelihood of expansion: neutral or very slightly Plaintiff

Given that two of the important factors came out in the plaintiff's favor, it is a close call whether summary judgment should be granted. *Monster, Inc.*, 920 F. Supp. 2d at 1070–71 ("Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in trademark cases and should be granted sparingly.") (cleaned up). But it's also important to apply the factors flexibly, taking account of the circumstances of the case. By the time of the defendant's September 2020 Bike+ product launch, the plaintiff's Bike+ app was mostly dormant, having gone through an extended update process that finished after September 2020. The last meaningful marketing for the app was in 2019. Subscriber and download numbers

were insubstantial and declining and a portion of them were for international consumers.[56] The Pebble Watch portion of the userbase was a very niche group of consumers who, owing to their very specific search criteria, were unlikely to be confused. And crucially, the Bike+ mark is descriptive and is joined in the marketplace by equivalent app names and variants on that composite mark. Not surprisingly, despite several years of coexistence, no evidence of actual confusion was submitted.

The plaintiff's 2021 app, launched soon after the defendant's product launch, does not add much to the picture. This is even though the court already held the 2021 app to be a bona fide commercial use, a test that requires only a very minimal showing. The 2021 app's key feature may not be functional, it has achieved no in-app sales, and the plaintiff made almost no meaningful marketing efforts.

This all creates a situation where the plaintiff's app had very little strength for the defendant's product launch to overtake. And if there is so little to overtake, reverse confusion must be unlikely. *See Ironhawk Techs.*, 2 F.4th at 1160 (reverse confusion occurs when a consumer "mistakenly thinks that the senior user is the same as or is affiliated with the junior user"); *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 474–75 (3d Cir. 2005) ("Chase did not overwhelm UTN's FREEDOM CARD at all. It is undisputed that CompuCredit FREEDOM CARD was not promoted or marketed after December 2001. Thus, FREEDOM CARD was out of the market for more than a year before Chase launched the CHASE FREEDOM card on January 27, 2003. We are therefore hard-pressed to understand how CHASE FREEDOM card could have overwhelmed UTN's FREEDOM CARD[.]").

That said, it's worth dwelling for a moment on whether this interpretation of the reverse-confusion context is supported by Ninth Circuit precedent. In that regard, the fact that the plaintiff's mark is descriptive is key. The *Ironhawk Techs.* court said that "[w]hether [the senior mark is] descriptive or suggestive, the important question in a reverse confusion case is whether the junior mark is so commercially strong as to overtake the senior mark." 2 F.4th at 1162

---

[56] Mattis Decl. – ECF No. 137-3 at 14–15 (¶¶ 47, 49) (under seal).

United States District Court
Northern District of California

1    (cleaned up). *But see id.* ("[T]he question [on summary judgment] is whether a reasonable jury

2    could find that [the] mark is at least suggestive[.]"). This would seem to suggest that even a

3    descriptive mark is ripe to be overtaken. But that one sentence does not necessarily tell the full

4    story, because in the more recent *Lodestar* decision, the court said "[g]iven that the [plaintiff's]

5    mark is properly considered distinctive for purposes of summary judgment, the strength-of-the-

6    mark factor in this reverse confusion case focuses on whether the junior mark is so commercially

7    strong as to overtake the senior mark." 31 F.4th at 1260 (cleaned up). In other words, if the

8    plaintiff's mark is descriptive rather than distinctive, the analysis can be different. That point is

9    consistent with rejecting a reverse-confusion claim that lacks sufficient mark strength and

10   supporting marketing efforts.

11        In sum, under these circumstances, confusion is possible but not probable. *Ironhawk Techs.*,

12   2 F.4th at 1167. Having come to the end, the court stops, grants summary judgment to the

13   defendant, and denies the plaintiff's motion for summary judgment as moot.

### CONCLUSION

16        The court grants summary judgment to the defendant and will separately enter judgment. This

17   disposes of ECF Nos. 134 and 135.

18        **IT IS SO ORDERED.**

19        Dated: February 16, 2024

_____
LAUREL BEELER
United States Magistrate Judge